IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 9, 2003 Session

## JAMES L. WEST, ET AL. v. FRANK LUNA

**Appeal from the Chancery Court for Lincoln County**
**No. 8380     Lee Russell, Chancellor**

**No. M2002-02734-COA-R3-CV - Filed January 6, 2004**

This appeal is the second in a 24 year long dispute over a proposed raceway in Lincoln County. After hearing additional proof as this Court required in *West v. Luna*, No. 01A01-9707-CH-00281, 1998 WL 467106 (Tenn.Ct.App.1998), the trial court entered a new injunction prohibiting the defendant Luna from operating a race track on Old Boonshill Road in Lincoln County. In this appeal, Mr. Luna challenges the trial court's injunction as noncompliant with our decision in the first appeal, and in imposing a noise limitation effectively making the race track a nuisance *per se*. We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL and FRANK G. CLEMENT, JR., JJ., joined.

Brad W. Hornsby, Aaron S. Guin, Murfreesboro, Tennessee, for the appellant, Frank Luna.

R. Whitney Stevens, Jr., Fayetteville, Tennessee, for the appellees, James L. West and wife, Nancy West; W. Thomas Norman and wife, Kathryn Norman; Paul Johnson and wife, Elizabeth Johnson; Margaret C. Jennings; David R. McCauley and wife, Rachel McCauley; Hubert C. Jennings and wife, Syble Jennings; Delbert McGee; Richard McGee and wife, Jean McGee; Roger J. Jones and wife, Wanda M. Jones; Paul D. Sain and wife, Cara Sain; Carl Kinkle; Ernest L. Jennings and wife, Sharon Jennings; Ray Barhorst and wife, Fay Barhorst.

### OPINION

This appeal represents a continuing saga, which began when the appellant's predecessor in interest attempted to open a dirt race track on Old Boonshill in Lincoln County. The facts of the dispute's origins appear in this Court's 1998 decision *West, et al. v. Luna*, No. 01A01-9707-CH-00281, 1998 WL 467106 (Tenn.Ct.App. Aug.12,1998) [West One].

In this appeal we are asked to determine whether the trial court appropriately applied the holding in West One in enjoining the appellant from developing a race track without first presenting

to the trial court a comprehensive construction plan that would reduce the sound level produced by the track to an average level no greater than 55 db measured at the location of the closest landowner, said average to be obtained over a period beginning one hour before race time and ending one hour post race time. The track's neighboring landowners have continuously and strenuously argued against the race track as a nuisance based on an excessive noise level. The landowners succeeded in obtaining an injunction in 1982 which, up until the events which led to this appeal, "enjoined [track owners] from operating a speedway 'until such time as [they] can and will operate same where the noise level will not be a nuisance to the plaintiffs.' " *West v. Luna*, 1998 WL 467106, * 2. This Court's decision in West One vacated a 1996 order of the trial court and reinstated the 1982 injunction. We held:

> Based on our independent review of the record pursuant to Tenn. R. App. P. 13(d), we have determined that the evidence preponderates against finding that there are no circumstances under which this track could be operated that would not cause a nuisance. Accordingly, an injunction preventing any racing at Mr. Luna's track is not warranted and the August 1996 order must be vacated.
>
> Our decision to vacate the August 1996 order does not leave Mr. Luna to conduct stock car races as he pleases. To the contrary, vacating the August 1996 order has the legal effect of reinstating the May 1982 order that enjoins the track operators from operating the track "until such time as . . . [they] can and will operate same where the noise level will not be a nuisance to the plaintiffs." Thus, Mr. Luna, as Mr. Holt's successor, remains enjoined from operating the track in a way that causes a nuisance to the track's neighbors.
>
> Ending our discussion here would leave the parties no better off than they have been since 1979 because they still lack objective standards for determining whether or not the noise from the track constitutes a nuisance. Even though the trial court concluded in 1981 that a noise level of 81 decibels was a nuisance, this standard is inadequate because it fails to indicate over what period of time the noise level should be averaged or the time of day when this noise level would be a nuisance. Other courts have been successful in fashioning precise noise standards in cases similar to this one. *See Sherrod v. Dutton*, 635 S.W.2d at 120 n. 3. Likewise, many local governments and at least one federal agency have established noise control regulations containing prescriptions for appropriate sound levels for particular environments and particular times of day.
>
> The dispute surrounding the operation of this track has been in and out of court for the past twenty years and requires a definitive closure. The parties are entitled to a definitive ruling either that operating a track on Old Boonshill Road is a nuisance per se that will not be allowed under any circumstances or that a race track may be operated on Old Boonshill Road as long as it meets objective, well-defined noise levels suitable for the locality and the character of the surrounding neighborhood as well as the time of day when the races will be conducted. Therefore, we remand this case to permit the parties to present evidence that will enable the trial court to decide,

once and for all, whether a track may be operated on Old Boonshill Road and, if it may be operated, the conditions for its operation.

*West, supra* at ** 8-9.

Upon remand, the trial court heard from several experts concerning the noise caused by the race track and the possible remedial measures and their expected effect on that noise level. The expert and lay testimony ran the gamut of noise possibilities, covering the topography of the region and the utility of earthen berms and ground barriers as well as mufflers to reduce the sound level at its source. The trial court heard from lay witnesses who testified to the difficulties they experienced when the dirt track was in operation in 1981 in conducting conversations and the daily activities of rest and relaxation one would expect from an otherwise quiet rural community. The trial court also heard expert testimony relating these disruptions and scientific data through the use of sound meters and application of various noise standards.

For their part, the appellees continued to press their argument that no circumstances exist under which Mr. Luna could operate a race track without causing a nuisance. Chief in that proof is the following testimony from Plaintiff's expert Ralph Mosely.

Q. Now, is there anything in your opinion that can be done to this land in Lincoln County, taking into consideration the location of the homes around this track, the topography in the area, that would allow this track to be operated in any manner under any circumstances and not be a nuisance to those residents that are living there now?

A. No, there is not, and I would like to explain why, if that's appropriate.

Q. Please do.

A. As Ms. Jennings so appropriately put, this racetrack is in a valley. It's similar to an amphitheater effect or a bowl-shaped effect. Noise created in the middle of the bowl radiates up the sides of the bowl. In this case, even if they were to put a berm or a wall, since the houses around the site are at a higher elevation, looking down into the valley, then there would be nothing between their line of sight from the houses and the racetrack itself to prevent the noise or reflect or absorb the noise. A wall would have to be as high as the surrounding houses in order for a wall around that track to have any effect. No matter what was done, whether there are mufflers or no mufflers or the number of cars is limited to two cars, the intensity of the noise as the cars accelerate and then decelerate produces a variability that is highly annoying or interfering with anyone trying to conduct conversation. Just about the time you get used to the peace and quite, for example, between a race, another race would start up, and then you could not maintain conversation.

The experts provided testimony concerning various industrial and environmental noise standards, among these are the OSHA standards for industrial sound and EPA standards for environmental noise. Specifically, Defendant Luna's expert, Mala Beard, references the EPA standard in his report

of May 28, 2000, to wit: "The EPA recommends levels for environmental noise not to exceed 55 dBA as measured by the Ldn outdoors and 45 dBA for Ldn indoors."

The trial court noted, and the record supports the conclusion that as of the date of trial on remand, Mr. Luna had no coherent plan for constructing the race track so as to minimize the noise level on the adjacent owners' property. He testified that he would consider building a wall at least on the portion of the track nearest the West's property, if not around the entire track. He testified that he could plant trees on the property, and that he intended to require mufflers on the cars that would race on his track. However, he submitted no complete construction plan and felt it unnecessary to do so absent any ruling from the court. Mr. Luna also testified to his limited education and that he had never operated a race track before. In addition, Mr. Luna has construction experience and he expressed his intention to "do whatever he had to" to avoid posing a nuisance for his neighbors. There is ample expert proof in this record that, were Mr. Luna to do all of the above, the noise level would still interfere with the normal activity of his adjacent landowners. As we said in West One,

> Whether a particular noise is sufficiently excessive to constitute a nuisance is ordinarily a question of degree and locality--in essence a question of fact to be considered in light of all the attending circumstances. *Cf. Caldwell v. Knox Concrete Prods., Inc.*, 54 Tenn.App. at 402, 391 S.W.2d at 9. The circumstances most frequently considered in determining whether noise amounts to a nuisance include: (1) the locality, (2) the character of the neighborhood, (3) the nature of the use causing the noise, (4) the extent and frequency of the injury, (5) the time of day when the noise occurs, and (6) the effects on the enjoyment of life, health, and property of those affected by the noise. *See Pate v. City of Martin*, 614 S.W.2d at 47; *see also Warren County v. Dickson*, 185 Ga. 481, 195 S.E. 568, 570 (Ga.1938); *Finlay v. Finlay*, 18 Kan.App. 4789, 856 P.2d 183, 189 (Kan.Ct.App.1993); *Racine v. Glendale Shooting Club, Inc.*, 755 S.W.2d 369, 372 (Mo.Ct.App.1988) .

*West v. Luna*, 1998 WL 467106, * 4.

The case was remanded to the trial court after West One on a finding that the evidence preponderated against a judgment that there were no conditions under which a race track could be operated on the property of the defendants, and that the evidence at that time did not support a finding of nuisance per se. Remand further was for the purpose of taking additional proof and articulating specific standards to be met by the defendants in order to operate the race track. Expert testimony taken after remand ranged from nuisance per se to averaging of decibel levels over an extended period of time. In reaching his conclusions from all of the evidence after remand, the trial court held:

> The Court of Appeals directed the attention of the parties to a footnote in the case of *Sherrod v. Dutton*, 635 S.W.2d 117 (1982). That footnote recited two collections of data which had been presented in the cases of *Bostic v. Smoot Sand and Gravel*, 154 F.Supp. 744 (D.Md.1957), and *Lee v. Rolla Speedway, Inc.*, 539 S.W.2d 627 (Mo.App.1976). One set of data matched decibel levels to particular activities,

for example, suggesting that conversational speech is conducted at a level of 50-60 decibels. The second set of data matched decibel levels to the level of complaint that would be made by neighbors at a particular decibel level or range, for example, if the decibel level of the intruding activity was in the range of 50-60, then there are "threats of community action."

Unfortunately, there was little evidence at the hearing on September 30, 2002, which was as complete and precise as the evidence cited in the footnote to the *Sherrod* case. There was no evidence concerning the decibel level at which the Plaintiffs begin to complain or at which Lincoln Countians begin to complain or at which rural residents in general begin to complain. The evidence was more anecdotal than it was the product of a survey, and the community standard was really proved more by anecdotal evidence and by analogy to EPA, OSHA, and HUD standards.

Before any standards can be applied, it is necessary that it be established over what period of time the noise levels are measured and averaged. The failure of the trial court earlier to establish how the noise level was to be averaged was one reason why the Court of Appeals vacated the trial court's 1996 injunction. The Defendant at trial reduced some of his average noise level figures by averaging them over longer periods of time, for instance a twenty-four hour period or a week. If a period of only background noise is averaged in with a period of intense racetrack activity, then obviously the average noise level is greatly reduced. It was necessary that the Defendant's own experts do this averaging using "silent" periods because without the inclusion of those periods, their own testimony concerning noise levels during races and standards for acceptable noise level would have established that the racetrack would be a nuisance. The Defendant argued that more noise should be tolerated because the track would only operate fifteen times a year, beginning in May and ending in August, and only on weekends.

There are circumstances in which averaging which includes "silent" periods would be appropriate. It is the conclusion of this trial court that in the facts of this particular case, in a rural/residential setting, where the homes were present before the racetrack was built, and where the racetrack was built in a topographical bowl, that it is appropriate to average the noise levels only over the period of four hours of racing plus an hour before the race and an hour after the race. Losing the peaceful enjoyment of your home and yard for a six hour portion of every Saturday during the warm months of every year is a very substantial loss and would constitute a nuisance even if it were quiet as a tomb next to the racetrack at 2:00 A.M. every Sunday of the year.

The fallacy of over reliance on an average decibel figure can be demonstrated by a very simple example. If someone sneaks up behind another person and explodes a balloon every ten minutes, that is a nuisance. It does not matter that the prankster is totally silent between his pranks. There was ample evidence at trial as to why *continual*, that is, periodically recurring loud noises, can be more of a nuisance than *continuous* loud noise, where the loud noise does not subside at all for a period of time. Each can be a nuisance, but the former requires multiple adjustments by the victim and the latter requires only one adjustment that must, however, be maintained.

The standard that is established by this trial judge in this situation is that the racetrack must contain its noise level so that there is no substantial interference with the conversations of the Plaintiffs in or outside their homes during the six hour periods during, just before, and just after races, and no substantial interference with the ability of the neighbors to sleep in their homes or conduct other "normal" activities inside or outside their homes during the same periods. The evidence in the case establishes that a decibel level in excess of 55 would impede normal conversation, so the Defendant cannot exceed that decibel level during operations, measured on the property of the Plaintiffs.

As a practical matter Defendants cannot meet the decibel level standards imposed by the trial judge, but the evidence does not preponderate against the fact findings of the trial court based upon his acceptance of some expert testimony and his rejection of other expert testimony.

These factual determinations enjoy a presumption of correctness on appeal absent a preponderance of the evidence to the contrary. Tenn.R.App.P. 13(d), *see Hawks v. City of Westmoreland*, 960 S.W.2d 101 (Tenn.1997). Having found no such preponderance, we affirm the order of the trial court in its entirety. The cause is remanded with costs taxed against the appellant for which execution shall issue.

_____
WILLIAM B. CAIN, JUDGE